**No. 11-31126**

# In the United States Court of Appeals for the Fifth Circuit

————————

ROBERT ANTOINE,

*Plaintiff-Appellant,*

v.

FIRST STUDENT, INC.,

*Defendant-Appellee.*

————————

**On Appeal From The United States District Court
For the Eastern District Of Louisiana, New Orleans**

————————

**BRIEF OF PLAINTIFF-APPELLANT**

————————

Todd R. McFarland, Esq.
General Conference of Seventh-day Adventist
Office of General Counsel
12501 Old Columbia Pike
Silver Spring, MD 20904
Telephone: (301) 680-6321
Facsimile:  (301) 680-6329
Email: mcfarlandt@gc.adventist.org

Victor R. Farrugia, Esq.
Law Firm of Victor R. Farrugia
Attorney at Law
1100 Poydras Street Suite 2010
New Orleans, LA 70163
Telephone: (504) 525-0250
Facsimile:  (504) 529-4579
Email: vrfarrugia@igc.org

Charles M. Kester, Esq.
The Kester Law Firm
Attorney at Law
1160 North College Avenue #1
Fayetteville, AR 72702
Telephone: (479) 582-4600
Facsimile:  (479) 571-1671
Email: cmkester@nwark.com

*Attorneys for Plaintiff-Appellant*

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### Case No. 11-31126

**ROBERT E. ANTOINE,**          **PLAINTIFF - APPELLANT**

**v.**

**FIRST STUDENT, INC.,**          **DEFENDANT - APPELLEE**

### CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1. Plaintiff-Appellant Robert E. Antoine.

2. Defendant-Appellee First Student, Inc.

3. Defense Counsel of Record, Magdalen Blessey Bickford of Jackson Lewis, LLP.

4. Appellant's Counsel of Record, Charles M. Kester of the Kester Law Firm.

5. Appellant's Counsel of Record, Victor R. Farrugia, Attorney at Law.

6. General Conference of Seventh-day Adventists.

7. FirstGroup America Holdings, Inc.

8. Laidlaw Transportation, Inc.

9. FirstGroup International, Inc.

1

10.   FirstGroup America, Inc.

11.   FirstGroup PLC.

Respectfully Submitted,

/s/Todd R. McFarland
Todd R. McFarland
Associate General Counsel,
General Conference of Seventh-day Adventists
12501 Old Columbia Pike
Silver Spring, MD. 20904-6600
*Attorney of Record for Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Robert Antoine ("Antoine") appeals from the district court's judgment, USCA5 945, which granted summary judgment to Defendant-Appellee First Student, Inc., ("First Student"), on Antoine's claim of failure to accommodate his religious observance of the Sabbath in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. *See* USCA5 925-44. Antoine requests oral argument.

Oral argument will assist the Court in understanding the legal errors which were committed by the district court contrary to the law of the Fifth Circuit and several sister circuits on these significant issues concerning the reasonable accommodation of religion under Title VII, and how these legal errors relate to the disputed issues of material fact as disclosed by the substantial record. Oral argument is the most efficient manner in which to provide this assistance to the Court, so that counsel can be available to assist this Court by responding to any questions it may have about the fact intensive record and the appropriate legal analysis applicable to this civil rights case which raises important issues concerning religious accommodation under Title VII.

# TABLE OF CONTENTS

Certificate of Interested Persons ..................................................... 1

Statement Regarding Oral Argument .................................................. 3

Table of Contents ....................................................................... 4

Table of Authorities ................................................................... 7

Jurisdictional Statement ............................................................... 10

Statement of Issues Presented for Review................................................ 11

Statement of the Case.................................................................. 12

Statement of the Facts................................................................. 14

    **1. Antoine's employment history with First Student.** .................................. 14

    **2. The collective bargaining agreement ("CBA").**.................................... 17

    **3. First Student was aware of Antoine's need for accommodation.**......... 18

    **4. First Student chose to discharge rather than accommodate Antoine.**................................................................. 20

    **5. The district court decision on summary judgment.** ............................. 30

Summary of Argument ................................................................ 32

Argument............................................................................... 35

    **Standard of review: This Court reviews the district court's grant of summary judgment *de novo*.**

**A.**     **The district court erred by holding an employer offer which had no effect upon the work-religion conflict was a reasonable accommodation as a matter of law.** .........................................37

1.    Supreme Court precedent requires that an accommodation eliminate the work-religion conflict in order to be a reasonable accommodation. ................................................................ 38

2.    Fifth Circuit precedent requires that an accommodation eliminate the work-religion conflict in order to be a reasonable accommodation. .................................................................... 42

3.    The district court decision creates a conflict with the law of at least five sister circuits which requires that an accommodation eliminate the work-religion conflict in order to be a reasonable accommodation. .................................................................. 48

4.    Because Franklin frustrated the accommodation process, the district court erred by failing to consider whether other accommodations would have eliminated the conflict without creating undue hardship. ................................................................................ 52

B.    The district court erred by ignoring undue hardship where the factual record shows that First Student could have accommodated Antoine without undue hardship. .............................................................. 55

1.    Because First Student's purported accommodation did not affect the work-religion conflict, the district court erred by failing to consider whether other accommodations would have eliminated the conflict without creating undue hardship. ........................................................................... 55

2.    Alternative accommodations did not create undue hardship in the form of decreased safety.. ....................................... 60

3.    Alternative accommodations did not create undue hardship by violating the CBA. ....................................................... 65

a.    Allowing Antoine to use his employer-provided unpaid absences and covering his shift with bench drivers could accommodate Antoine without undue hardship….....66

**b.      Partial shift swaps could accommodate Antoine without undue hardship.** .......................................................69

**c.      Returning Antoine to bench driver status could accommodate Antoine without undue hardship.** .................. 70

**d.      A voluntary route change could accommodate Antoine without undue hardship.** .......................................................... 71

Conclusion................................................................................................... 72

Certificate of Service ................................................................................. 74

Certificate of Compliance .......................................................................... 75

# TABLE OF AUTHORITIES

**CASES** **Page**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................................ 35

*Ansonia v. Philbrook,* 479 U.S. 60 (1986).......................... 34, 41, 42, 44, 48, 50, 51

*Baker v. The Home Depot*, 445 F.3d 541 (2nd Cir. 2006) .......................................49

*Balint v. Carson City, Nev.,* 180 F.3d 1047 (9th Cir. 1999) ....................................69

*Beadle v. City of Tampa*, 42 F.3d 633 (11th Cir. 1995).....................................56, 57

*Benton v. Carded Graphics, Inc.*, 1994 WL 249221 (4th Cir. 1994) .......................51

*Boudreaux v. Swift Transp. Co., Inc.,* 402 F.3d 536 (5th Cir. 2005) ........................... 35

*Brener v. Diagnostic Ctr. Hosp.,* 671 F.2d 141 (5th Cir. 1982)..................52, 55, 56

*Brown v. Gen. Motors Corp.,* 601 F.2d 956 (8th Cir. 1979) ........................61, 62, 68

*Brown v. Polk County, Iowa*, 61 F.3d 650 (8th Cir. 1995)
  (*en banc*), *cert. denied*, 516 U.S. 1158 (1996)....................................................61

*Bruff v. North Miss. Health Servs., Inc.,*
  244 F.3d 495 (5th Cir. 2001) .........................................31, 35, 36, 45, 46, 47, 59, 60

*Cloutier v. Costco Wholesale Corp.,* 390 F.3d 126 (1st Cir. 2004) .........................61

*Cooper v. Oak Rubber Co.*, 15 F.3d 1375 (6th Cir. 1994) .......................................49

*Draper v. United States Pipe & Foundry Co.,* 527 F.2d 515 (6th Cir. 1975) ....... 60, 61

*EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219 (6th Cir. 1991) .......................65

*EEOC v. Chemsico, Inc.,* 216 F. Supp.2d 940 (E.D. Mo. 2002) ......................68, 69

*EEOC v. GEO Group*, 616 F.3d 265 (3rd Cir. 2010) ...............................................49

*EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307 (4th Cir. 2008)...............51

*EEOC v. Ilona of Hungary, Inc.,* 108 F.3d 1569 (7th Cir. 1997) .............................50

*EEOC v. Ithaca Indus., Inc.,* 849 F2d 116 (4th Cir.) (*en banc*),
    *cert. denied*, 488 U.S. 924 (1988) ....................................................................51

*EEOC v. Universal Mfg. Corp.,* 914 F.2d 71 (5th Cir. 1990) .......34, 43, 44, 45, 47, 48

*Eversley v. MBank Dallas*, 843 F.2d 172 (5th Cir. 1988)............................44, 45, 47

*Fontentnot v. Upjohn Co.,* 780 F.2d 1190 (5th Cir. 1986)...............................36, 59, 60

*Ford v. City of Dallas*, 2007 WL 2051016 (N.D. Tex. 2007) ............36, 59, 60, 62, 65

*Getz v. Penn. Dept. of Public Welfare,* 802 F.2d 72 (3rd Cir. 1986)........................49

*Grimes v. Tex. Dep't of Mental Health and Mental Retardation*,
    102 F.3d 137 (5th Cir. 1996)........................................................................62, 65

*McGuire v. General Motors Corp.,* 956 F.2d 607 (6th Cir. 1992) ...........................54

*Minkus v. Metropolitan Sanitary Dist. of Greater Chicago,*
    600 F.2d 80 (7th Cir. 1979).................................................................................53

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000).........................35

*Trans World Airlines, Inc. v. Hardison,*
    432 U.S. 63 (1977)........................................ 33, 34, 39, 40, 41, 42, 43, 44, 48, 51

*Opuku-Boateng v. State of Cal.,* 95 F.3d 1461 (9th Cir. 1996) ................................50

*Smith v. Pyro Min. Co.,* 827 F.2d 1081 (6th Cir. 1987) ...................................60, 61, 62

*Smith v. Xerox Corp.,* 602 F.3d 320 (5th Cir. 2010)..................................................53

*Sturgill v. United Parcel Service, Inc.*,

    512 F.3d 1024 (8th Cir. 2008) .......................................................51, 57, 58, 59, 61

*Toledo v. Nobel-Sysco, Inc.,* 892 F.2d 1481 (10th Cir. 1989) ............................53, 62

*Tooley v. Martin-Marietta Corp.,* 648 F.2d 1239 (9th Cir.),
    *cert. denied,* 454 U.S. 1098 (1981)....................................................................62

*Wardlaw v. Inland Container Corp.,* 76 F.3d 1372 (5th Cir. 1996)........................36

*Weber v. Roadway Express, Inc.,* 199 F.3d 270 (5th Cir. 2000) .............................57

**STATUTES**

28 U.S.C. § 1291 ................................................................................ 10

28 U.S.C. § 1331 ................................................................................ 10

28 U.S.C. § 1343(a)(4) ........................................................................ 10

42 U.S.C. § 2000e ................................................................. 3, 13, 36

42 U.S.C. § 2000e-2 ........................................................................... 53

42 U.S.C. § 2000e-3 ........................................................................... 53

42 U.S.C. § 2000e-5 ........................................................................... 10

**REGULATIONS**

29 C.F.R. § 1605.2 ............................................................................. 53

**JURISDICTIONAL STATEMENT**

The district court's jurisdiction was based upon a federal question, 28 U.S.C. §§ 1331, 1343(a)(4) and 42 U.S.C. § 2000e-5. The final judgment appealed from was entered by the United States District Court for the Eastern District of Louisiana, New Orleans Division, the Honorable Daniel E. Knowles, III, United States Magistrate Judge, who heard this case by the parties' consent, on November 4, 2011. USCA5 945. The notice of appeal was filed on December 1, 2011. USCA5 946-47. Appellate jurisdiction exists under 28 U.S.C. § 1291.

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

Whether the district court erred when it applied an improper legal standard that was contrary to the law of this Circuit and several sister circuits to hold that a purported accommodation (the "opportunity" for voluntary shift swaps) which had no effect at all upon the work-religion conflict was a reasonable accommodation as a matter of law.

Whether the district court erred when it granted summary judgment where First Student could have reasonably accommodated Antoine by any one or more of several alternative methods that were available and did not create any undue hardship upon First Student, but were ignored by First Student and the district court.

## STATEMENT OF THE CASE

First Student, Inc. ("First Student"), provides bus services for the Jefferson Parish School District ("Jefferson PSD") under a contract with Jefferson PSD. USCA5 431-39. Robert Antoine ("Antoine") worked for First Student as a school bus driver in Jefferson PSD. USCA5 585-86. Antoine worked a "split shift," transporting students from their homes to their schools in the morning, and reversing those routes to return the students in the afternoon. USCA5 552-53.

As a Seventh-day Adventist, Antoine observes the Sabbath by abstaining from secular work from sundown on Friday through sundown on Saturday. USCA5 709. Antoine's religious observance of the Sabbath created a conflict with his work schedule on a small number of Fridays during the winter when the daylight hours were the shortest, and Daylight Savings Time ended. USCA5 709. Although Antoine had been successfully employed by First Student as a bus driver in another school district without incident, USCA5 700, 709, this time First Student terminated Antoine's employment when, in the absence of any effective accommodation by First Student, he did not work on five Friday evenings during November 2009 to January 2010 in order to avoid violating his Sabbath. USCA5 580-86.

Antoine filed suit alleging that First Student's failure to accommodate his religious observance of the Sabbath resulted in his termination in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. USCA5 7-12. First Student moved for summary judgment claiming that: (1) First Student offered a reasonable accommodation in the form of a voluntary "shift swap" which Antoine declined, and (2) other reasonable accommodations in the form of partial shift swaps, the use of so-called "bench" drivers, and a return of Antoine to the status of bench driver would cause undue hardship to First Student. USCA5 376-400.

The district court granted summary judgment to First Student, reasoning that "Because the Court finds that First Student attempted to reasonably accommodate [Antoine's] religious belief, the Court need not reach the question of whether any accommodation suggested by [Antoine] would pose an undue hardship on First Student. In short, because First Student offered a reasonable accommodation to [Antoine], the Court need not determine whether First Student has demonstrated undue hardship in light of [Antoine's] proposed alternative accommodations." USCA5 943 (citations omitted). By notice filed on December 1, 2011, Antoine appealed. USCA5 946.

## STATEMENT OF THE FACTS

Robert Antoine has been a member of the Seventh-day Adventist faith for more than thirty years. USCA5 712. While working for First Student, he was a member of the leadership of the local Seventh-day Adventist congregation, holding the position of First Elder. USCA5 785.[1] Part of Antoine's religion is the observance of the Sabbath, which includes abstaining from secular work, from sundown on Friday to sundown on Saturday. This case arises due to the conflict between Antoine's religious observance of the Sabbath and First Student's work schedule which required him to work for forty minutes or less during each of five Sabbaths that fell between November 6, 2009, when Daylight Savings Time ended, and January 29, 2010. USCA5 724, 770-77.

### 1.     Antoine's employment history with First Student.

Antoine was employed by First Student as a school bus driver in the New Orleans area. First Student is a large foreign (UK) company which operates more than 65,000 buses from 650 locations in roughly 40 states. USCA5 425, 779. One of these locations is Jefferson PSD. First Student provides bus services (including

---

[1] Although First Student attempts to create a *post hoc* issue regarding the sincerity of Antoine's religious belief, the evidence of record is that Antoine's sincerity was never an issue during the accommodation process. USCA5 744. First Student did not contest the elements of Antoine's *prima facie* case at summary judgment, USCA5 377, 387, as the district court properly noted. USCA5 930, 939.

drivers) to Jefferson PSD under a "Transportation Contract." USCA5 431-39. Under this contract, Jefferson PSD employees select their routes, and the remaining unfilled routes are contracted to First Student. USCA5 442. These routes are "split shifts" which require bus drivers to pick up students in the morning and deliver them to school, then return in the afternoon to pick up the students at their respective schools and deliver them to stops near their homes. USCA5 552-53, 703-04.

Antoine worked as a bus driver for First Student for two academic years in two different school districts. Antoine first applied to work as a bus driver for First Student in April 2008. USCA5 530, 916-19. First Student hired Antoine as a bus driver to serve Orleans Parish for the 2008-09 academic year. USCA5 545. While Antoine worked for First Student at Orleans Parish, he never experienced a conflict between his religious observance of the Sabbath and his work schedule, as his Friday PM route was always completed before sundown. USCA5 700. After the conclusion of the 2008-09 academic year, Antoine applied for a position with First Student at Jefferson PSD. USCA5 702.

When Antoine applied for this second position with First Student in June 2009, he filled out a standardized application form which contained no questions regarding availability, work hours or the need for accommodation. USCA5 527-

31. Antoine was interviewed by First Student employee Ella Cade, who used a "Driver Interview Guide" form to structure and record her notes of the interview. USCA5 539-41. Antoine testified that he discussed his religion and the limitations that it imposed on his availability during the Sabbath in the interview, although this did not seem to be a significant topic at the time of the interview. USCA5 706-07. The "Driver Interview Guide" form that Cade filled out notes that Antoine discussed this inability to work during the weekend. USCA5 540. Cade confirmed that Antoine "may have" discussed his religious practice during the interview, but that it was not a "major concern" since First Student does not usually "have weekend work anyway" and "[u]nless he render [sic] details, I'm not allowed to ask any details." USCA5 535.

After this interview, on or about July 23, 2009, Antoine was again hired as a bus driver by First Student. USCA5 545. Antoine initially worked as a "bench" driver. USCA5 703. Bench drivers do not have an assigned route, but report to work in order to fill in for regular drivers who are absent. USCA5 422-23, 442, 446, 472, 476, 703. On or about September 11, 2009, Antoine was assigned to the route designated as "FS651." USCA5 477-78, 703, 709, 721. This route consisted of three different schools (Woodmere, Pittman and St. Ville), and the afternoon portion of the route typically ended around 5:40 PM. USCA5 444, 552. Antoine

was described as a "dedicated driver" and a "good driver, no problems." USCA5 473, 724. He had no attendance issues and missed no days prior to the five absences for Sabbath observance that resulted in his discharge. USCA5 707.

### 2.     The collective bargaining agreement ("CBA").

First Student is a signatory to a collective bargaining agreement ("CBA") with Local 270, International Brotherhood of Teamsters. Under the CBA, drivers are classified either as "regular" drivers, who have an assigned route, or "bench" drivers who provide coverage for First Student drivers.[2] USCA5 472, 489. Bench drivers are hired for the purpose of "covering" or filling in for regular drivers who are, for whatever reason, absent from work. USCA5 422-23, 442, 446, 472, 476, 703.

Under the CBA, routes are bid by seniority at the beginning of the academic year. USCA5 489. Routes that become available during the year are also bid under a similar process.  USCA5 490.  Routes that remain unfilled after the bidding process are assigned in reverse seniority order. USCA5 489.

Article IX, Section 12 of the CBA prohibits "swapping of routes" but also contains a provision for voluntary route changes. Under that process, "A driver or

---

[2] A third category of drivers, "spare" drivers, is similar to "bench" drivers, except that they provide coverage for Jefferson PSD bus drivers rather than First Student drivers. USCA5 472.

monitor that wishes to vacate his or her route will have the route posted by the

Employer and it will be advertised for three (3) days and assigned to the senior

driver picking the route. The position vacated by the picking driver or monitor will

be assigned to the driver or monitor that caused the vacancy." USCA5 490.

With the exception of the limitations specified under the CBA, the CBA

acknowledges and agrees that First Student retains broad discretion in management:

> The management of the business and the direction of the employees
> including but not limited to, the right to hire, promote, assign work,
> define or modify bus routes, discipline and discharge, schedule
> working hours, overtime and working days, make and enforce work
> rules are vested exclusively in the Employer except as expressly
> limited and set forth in writing in this Agreement.

USCA5 484. One of these "work rules" or policies that First Student has adopted is

an attendance policy. Under this policy, First Student provides drivers with "three

full days they can miss and six half days of absences." USCA5 717.

### 3.    First Student was aware of Antoine's need for accommodation.

In 2009, Daylight Savings Time ended at 2:00 AM on the morning of

Sunday, November 1, 2009. USCA5 452, 577. As a result of the time change, from

November 6, 2009, through January 29, 2010, the beginning of Antoine's Sabbath

(sundown on Fridays) occurred as early as 5:00 PM, and conflicted with his work

schedule for approximately thirty to forty minutes on each of those Fridays. *See*

USCA5 724, 754-55. As a result of the school holidays and the end of the Fall academic semester, there were several Fridays during this period that were either not scheduled workdays or involved a shortened work schedule, so that the work-religion conflict resulting from the sundown times and the change from Daylight Savings Time consisted of only eight regular Friday workdays between November 6, 2009, and January 29, 2010.

On Friday, October 30, 2009, Antoine realized that the impending end of Daylight Savings Time would result in such a conflict between his religious observance of the Sabbath and his work schedule, so he informed his dispatcher (Candace Astorga) of the upcoming problem. USCA5 709-10. Antoine's report was in full compliance with the First Student policy regarding absences, and it was undisputed that Antoine gave proper notice for all of his Friday absences under this policy. USCA5 460, 467. When Antoine told a second dispatcher (Nadia Phillips) about the need for someone to temporarily cover his Friday afternoon routes, her response was that "she could do that so long as she received approval from the contract manager, Mr. Franklin." USCA5 779. First Student was aware of the limited duration of this conflict. USCA5 561-62.

Antoine's concerns were communicated to Ed Franklin, the "Contract Manager and Antoine's Supervisor. The following Monday, November 2, Franklin and Antoine had a meeting in Franklin's office.

19

USCA5 723-24. Judith Jackson, one of the local union shop stewards, also attended that meeting. USCA5 723-24. During this meeting, Antoine explained that he was a Seventh-day Adventist and described the nature of the work-religion conflict. USCA5 724.

That same day, Franklin sent an email to Danny Guerdon, the Region Human Resources Manager, reporting that "We have a notice from Employee Robert Antoine that he is not able to work on Friday PM because of his religion. He is a 7th day Advantage [sic]." USCA5 457, 562, 735. Franklin, who denied any awareness of a duty to reasonably accommodate religious practices, USCA5 736, flatly stated that "[w]here I'm sitting I can't allow this because this is a Monday thru Friday job." USCA5 562. Franklin was aware that Antoine wanted an accommodation to eliminate this conflict on Fridays, USCA5 453, 455, and he instructed Antoine that if he could not complete all three of his routes on Friday afternoons, he should stay at home. USCA5 707, 711, 724, 733.

### 4.    First Student chose to discharge rather than accommodate Antoine.

On November 6, while this accommodation decision was still pending, USCA5 748, and with full knowledge that the only reason Antoine was absent on Friday afternoon was "due to religion," USCA5 553, Franklin issued Antoine a

written warning, the first step in First Student's progressive disciplinary process. USCA5 580. This discipline was administered on the morning of November 6, before the absence had even occurred. USCA5 724. During this meeting, Franklin instructed Antoine that "if he could not drive all three schools on Friday afternoons, he should stay home and not come to work at all on that afternoon." UCSA5 724.

Antoine, following Franklin's instruction, did not report to work the following four regular Fridays, was issued additional disciplinary notices, and was ultimately terminated. USCA5 581-86. The sole reason for Antoine's termination was these five absences which were caused by the conflict between Antoine's religious observance of the Sabbath and his Friday afternoon work schedule. USCA5 585-86. The only reason for the discipline and discharge of Antoine was "habitual tardiness or absence" which First Student's policy states "will be cause for disciplinary action." USCA5 427. Antoine was denied any of the "three full days they can miss and six half days of absences" that are provided as a driver benefit under First Student policy. USCA5 717.

The First Student managers who were involved in making the accommodation decision regarding Antoine's work-religion conflict gave conflicting testimony as to what was actually done by First Student during the

accommodation process. Guerdon, the Regional HR Manager, claimed that a voluntary shift swap and the use of bench drivers were considered by First Student. USCA5 419. According to Guerdon, no other potential accommodations were considered or communicated. USCA5 421. Franklin, the local Contract Manager, testified that the only potential accommodation that was offered by First Student was an illusory "opportunity" for Antoine to arrange voluntary shift swaps with other drivers. USCA5 453-54, 456, 465-66.

At the same time that he made this offer, Franklin actively undermined and frustrated this supposed "opportunity" to voluntarily exchange shifts. It was obvious to all persons involved that Antoine was a relatively new employee at the Jefferson PSD location and was unfamiliar with the other routes and drivers. USCA5 520, 724-25. During the November 6 meeting, Franklin represented that he and the dispatchers would "find a driver to swap routes" with Antoine. USCA5 724.

Although Franklin now claims that he told Antoine that it was solely Antoine's responsibility to find drivers to exchange shifts, Phillips, who attended that meeting flatly contradicted Franklin's self-serving testimony. USCA5 724. Franklin never even attempted to arrange an exchange of shifts, now insisting that burden to arrange a shift swap always rested solely and entirely upon Antoine.

In contrast, First Student admits that Antoine attempted to cooperate in the accommodation process by taking the initiative to locate a willing partner for a shift swap. Antoine "indisputably went out and tried to find a voluntary shift swap and he did that by talking to a group of bus drivers." USCA5 951-52. Antoine spoke with the dispatchers, drivers Moneik Lee and Percy Washington, and also sought such an exchange from "a big group of drivers" and "many other drivers." USCA5 893. Once Antoine's efforts came to Franklin's attention, Franklin interfered with and undermined these efforts by arbitrarily imposing new conditions, such as a requirement that the exchange be for a full week. USCA5 565-66. Unsurprisingly, the "voluntary swap," which was the only potential accommodation ever put forth by Franklin never materialized and had no effect upon the work-religion conflict experienced by Antoine. USCA5 421.

In addition to the record evidence of Franklin's refusal to participate in good faith in the accommodation process, and his active frustration of that process, First Student offered contradictory positions regarding the purported accommodation. While acknowledging that voluntary shift swaps were prohibited by the CBA and therefore required the consent of the local union in the form of a memorandum of understanding, or "MOU," First Student simultaneously argued that the "opportunity" for these swaps was nevertheless a reasonable

accommodation despite the prohibition of the CBA, even in the absence of the required MOU. USCA5 955. This supposed "opportunity" was wholly illusory, as the CBA plainly states "There shall be no swapping of routes." USCA5 490. Guerdon, the Regional HR Manager, admits that such an "opportunity" was prohibited "on a long term basis" although the union might agree to a "side agreement" for a "very short term basis." USCA5 421; *see also* USCA5 427. A local MOU would be required, and no such MOU was ever obtained. USCA5 427. First Student never made any effort to negotiate the MOU, and there has never been any such MOU in effect.

Although the only potential accommodation that was ever offered to Antoine was the ineffective "opportunity" for a voluntary swap of a full shift, several other potential accommodations were available to First Student but were never considered by First Student or provided to Antoine. Each of these potential accommodations was permissible under the CBA, and none of these potential accommodations resulted in any increased cost or hardship for First Student. First Student was aware of each of these potential accommodations, and had used some of them before, but simply chose not to bother in this case. There were at least four methods by which First Student could have, but chose not to, accommodate Antoine.

First, an exchange of part of Antoine's Friday afternoon shift was permitted by the CBA and was available to First Student, but was rejected out of hand. Second, unpaid absences were also available, but were never considered despite the fact that this very method of accommodation had been previously employed by First Student when similar work-religion conflicts arose. Third, First Student had the ability to return Antoine to his previous position as a bench driver, which would have alleviated the work-religion conflict. Fourth, Article IX, Section 12 of the CBA provides a mechanism for voluntary route changes which was ignored by First Student.

Under the CBA, routes are subject to change, and all the drivers know this. USCA5 739. Article V of the CBA makes clear that First Student has the unilateral right to change the terms and conditions of employment "including but not limited to [the right to], … define or modify bus routes, … schedule working hours, overtime and working days, [and] make and enforce work rules" except as expressly limited in writing in the CBA. USCA5 484. The CBA, after reserving this right to First Student, never prohibits a partial shift swap. USCA5 480-505. Such partial swaps have been made by the dispatchers. USCA5 829 (coverage of two of Antoine's three routes), 832.

First Student provides its drivers with "three full days they can miss and six half days of absences." USCA5 717. First Student has previously allowed drivers to use these absences on Fridays as a religious accommodation, and Larry Whitler, a director of Human Resources for First Student, testified that these accommodations did not create any hardship for First Student. USCA5 746, 748-49. Prior to his Friday absences in order to observe the Sabbath, Antoine had not missed any work. USCA5 707. As a result, under First Student policy, Antoine was entitled to six half days and three full days of absences, which were more than sufficient to cover the five Friday PM shifts that resulted in his discharge and the three remaining Fridays when sundown occurred prior to the end of Antoine's shift. Allowance of these absences would have wholly eliminated the conflict.

Bench drivers were available to cover Antoine's absences. USCA5 717. On each of the five Fridays that Antoine was absent,[3] at least one bench driver was available to drive Antoine's afternoon routes. USCA5 770, 827-29. Antoine experienced a conflict on only two other Fridays: January 22 and January 29, when the sun set between 5 and 11 minutes before 5:40 PM. USCA5 774-75, 834. Bench drivers were available to cover his route on each of these days as well.

_____

[3] November 6, November 13 (which was not counted among the absences causing Antoine's discharge), November 20, December 4, December 11, 2009, and January 15, 2010.

The conflict between Antoine's Sabbath observance and his work schedule ended the following Friday, February 5, when sunset did not occur until Antoine's scheduled end time. USCA5 776. First Student was aware of the limited duration of this conflict. USCA5 561-62.

Employee absences are an expected part of the routine business of First Student, which is in part the reason for the employment of bench drivers. USCA5 424, 429, 758. First Student recognized this as a method of accommodation, and had in fact allowed other drivers to be absent on Fridays for reasons including religion. USCA5 746. Indeed, First Student admits that when Antoine informed one of his dispatchers (Ms. Phillips) about the need for someone to temporarily cover his Friday afternoon routes, she "indicated that she could do that so long as she received approval from the contract manager, Mr. Franklin." USCA5 779. In the case of Antoine, Franklin did not permit this normal practice, simply because "it is not convenient." USCA5 463. As a result, Antoine was denied the benefit of the absences to which he and all other drivers were entitled under First Student policy.

In addition, Antoine offered to return to work as a bench driver, which was a position that he previously held before being assigned the route that gives rise to this appeal. USCA5 453, 707. These bench drivers leave, if they are not assigned to a route, in two groups, one at 4:30 PM and a second at 5:00 PM. USCA5 517-18,

719. Even when assigned to a route, approximately 80% of the bench drivers finish their routes by 5:00 PM. USCA5 462. Dispatchers assign bench drivers, and such assignments are not made by seniority. USCA5 959. Thus, as a bench driver, on Fridays Antoine could have received an assignment that permitted him to finish before sundown.

Article IX, Section 12 of the CBA contains a provision for voluntary route changes. Under that process, "A driver or monitor that wishes to vacate his or her route will have the route posted by the Employer and it will be advertised for three (3) days and assigned to the senior driver picking the route. The position vacated by the picking driver or monitor will be assigned to the driver or monitor that caused the vacancy." USCA5 490. In other words, in order to accomplish a route change for Antoine, First Student would post the route for bid. The bidder with the highest seniority would receive Antoine's route, and Antoine would in turn take the successful bidder's route. USCA5 956. If there was no bidder, the route would be assigned to a bench driver and Antoine would become a bench driver. USCA5 958. In this case, bus driver Judith Jackson testified that she would have bid on Antoine's route if it had been posted. USCA5 725. This would have accommodated Antoine, since Jackson's route ended by 4:45 pm. USCA5 679. First Student was aware that placing Antoine on a different route was a possibility. USCA5 561 ("there is

nothing to say that we can't put him on another route which does not include Friday

PM's"). Despite this awareness, Franklin never discussed it with Antoine. USCA5

419-20.

Although the issue of undue hardship was not reached by the district court,

USCA5 943, the evidence of record demonstrates two significant facts regarding

undue hardship. First, none of the potential accommodations, which would result

in a bench driver covering Antoine's Friday PM route (or another bidder

delivering his route, with Antoine returning to bench driver status) result in any

increase in cost. USCA5 458. Indeed, First Student properly made no such claim.

*See* USCA5 376-400, 897.

Second, First Student's claim that the use of bench drivers was an unsafe

practice is a disputed fact. The very accommodation suggested (and then frustrated)

by First Student – voluntary shift swaps – results in a substitute driver for each of

Antoine's three Friday PM routes, and the possibility of a different substitute driver

on each Friday. In contrast, the accommodations suggested by Antoine provide First

Student with greater driver consistency. The conduct of First Student contradicts its

claim of a purported hardship on the basis of safety.

Lynn Alello, the Director of Transportation for Jefferson PSD, also

contradicted First Student's claim of hardship based upon safety, testifying that the

use of substitute drivers did not endanger the lives of students and was a safe practice for the children. USCA5 441, 448. The use of bench drivers was a regular daily practice for First Student, with bench drivers covering routes (including Antoine's) virtually every workday. USCA5 568-75. There were no complaints about the use of bench drivers covering Antoine's Friday PM routes. USCA5 470.

### 5.    The district court decision on summary judgment.

The district court granted summary judgment to First Student on the basis that because First Student had "attempted" an accommodation in the form of the "opportunity" for voluntary shift exchanges, it had demonstrated the affirmative defense of reasonable accommodation as a matter of law, even though this "attempt" to provide an "opportunity" had no effect whatsoever upon the work-religion conflict experienced by Antoine. USCA5 943.

Because the district court decided that First Student had proved the affirmative defense of reasonable accommodation, the district court concluded that it did not have to consider other potential accommodations that would not result in any hardship to First Student. The district court explained that "Because the Court finds that First Student attempted to reasonably accommodate [ Antoine's] religious belief, the Court need not reach the question of whether any accommodation suggested by [Antoine] would pose an undue hardship on First Student. In short, because First Student offered a reasonable accommodation to [Antoine], the

Court need not determine whether First Student has demonstrated undue hardship in light of [Antoine's] proposed alternative accommodations." USCA5 943 (citations omitted).

The district court also stated that "Whether an employer has reasonably accommodated an employee's religious beliefs is a question of law." USCA5 939 (citing *Bruff v. North Miss. Health Servs., Inc.,* 244 F.3d 495, 501 (5th Cir. 2001)). It is unclear from the district court's formulation whether the district court viewed the question of reasonable accommodation to <u>always</u> be a question of law or to merely be a question of law in this case due to the (allegedly) undisputed facts. *Bruff* states that "Once the [employer] establishes that it offered [the employee] a reasonable accommodation, even if that alternative is not her preference, they have, as a matter of law, satisfied their obligation under Title VII." 244 F.3d at 501. *Bruff is* consistent with established law that the normal summary judgment standard applies to the issue of reasonable accommodation. To the extent that the district court implied that the issue of reasonable accommodation is always a question of law without regard to disputed material facts relating to that issue, it is a deviation from the established law in this and other circuits.

## SUMMARY OF ARGUMENT

The district court improperly granted summary judgment to First Student on the affirmative defense of reasonable accommodation. First Student's purported accommodation had no effect upon the work-religion conflict that Antoine experienced. First Student undermined and frustrated the accommodation process at virtually every turn. Even under First Student's self-serving (and disputed) account, the most that First Student can claim to have done was merely "attempt" to provide an "opportunity." An "opportunity" to eliminate the work-religion conflict is not the same thing as actually doing it. An "attempt" to provide such an opportunity is one step further removed. The district court applied an improper legal standard for evaluating what constitutes a reasonable accommodation. The district court's error was compounded by its resulting failure to consider the reasonable accommodations that were available to (but ignored by) First Student.

The district court also erred in granting summary judgment without considering other available accommodations that did not result in any hardship to First Student. Genuine issues of material fact exist as to whether First Student could have reasonably accommodated Antoine without undue hardship by: (1) allowing Antoine to exercise the unpaid leave that he was provided under First Student policy and using bench drivers to cover his absences; (2) partial shift

32

swaps or route adjustments; (3) returning Antoine to bench driver status; and (4) using the voluntary route exchange process under the CBA. Any one or more of these accommodations would have eliminated the work-religion conflict. First Student's self-serving claims that undue hardship exists in the form of a vaguely-defined concern with "safety" are disputed. They are contradicted by First Student's actions and the testimony of the disinterested witness from Jefferson PSD. Although these potential accommodations were available to First Student, and would result in no undue hardship to First Student, they were simply ignored. Because of these issues of material fact, First Student failed to establish either of the affirmative defenses of reasonable accommodation or undue hardship beyond peradventure. Accordingly, summary judgment should be reversed and the case remanded for trial.

The Supreme Court has twice addressed the religious accommodation requirement of Title VII. Both times, the Supreme Court has made clear that unless an accommodation is effective, it cannot be a reasonable accommodation and the employer must therefore prove undue hardship. This principle was first established in *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63 (1977), in which an employer's "attempt [] to find a solution," partial accommodations which addressed some but not all days of religious observance by the plaintiff, and the

offer of a chance to "swap shifts, which apparently was normal procedure," 432 U.S. at 77, were not reasonable accommodations because they did not eliminate the conflict. In *Ansonia v. Philbrook,* 479 U.S. 60 (1986), the Supreme Court reinforced the requirement that an accommodation must effectively eliminate the work-religion conflict in order to be reasonable. 479 U.S. at 70.

This Circuit has followed the Supreme Court by adopting the same elimination standard for evaluating the reasonableness of any purported "accommodation." The elimination standard employed by the Supreme Court in *Hardison* and *Ansonia* has been adopted by this Circuit, which has held that an accommodation that does not fully and completely eliminate the conflict between work and religion is not a reasonable accommodation. *EEOC v. Universal Mfg. Corp.,* 914 F.2d 71, 73 (5th Cir. 1990). Incomplete "accommodations" which do not effectively accommodate the employee's religious practice are at odds with the plain language of Title VII and were characterized by this Court as "patently unreasonable." 914 F.2d at 73.

The district court's finding that an ineffective attempt was a reasonable accommodation, USCA5 943, also creates an unnecessary conflict with at least five other circuits that have addressed the issue of whether something less than elimination of the conflict is a reasonable accommodation. Each of these circuits

34

has determined that elimination of the conflict is required in order for a proffered accommodation to satisfy the affirmative defense of reasonable accommodation as a matter of law.

## ARGUMENT

### Standard of review: This Court reviews the district court's grant of summary judgment *de novo*.

This Court reviews a grant of summary judgment *de novo*, applying the same standard as the district court. This Court views the facts in the light most favorable to Antoine, and all reasonable inferences are drawn in his favor and resolved against First Student. *Boudreaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005).

Credibility determinations and weighing of the evidence are inappropriate during summary judgment proceedings. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Ordinarily, questions of reasonableness are for the factfinder, and judgment as a matter of law on such an issue is appropriate only where the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable minds could not arrive at a contrary conclusion. *Bruff v. North Miss.*

*Health Servs., Inc.,* 244 F.3d 495, 499 (5th Cir. 2001) (citing *Wardlaw v. Inland Container Corp.,* 76 F.3d 1372, 1375 (5th Cir. 1996)).

This case turns on First Student's claimed affirmative defenses. The law is clear that reasonable accommodation and undue hardship are affirmative defenses, and that First Student bears the burden to prove that it either provided reasonable accommodation or was unable to do so without incurring undue hardship. *Bruff*, 244 F.3d at 499-500 (citing 42 U.S.C. § 2000e (j)). This much is conceded by First Student. USCA5 387, 950. Because First Student bears the burden of proof on these affirmative defenses, in order to obtain summary judgment, First Student must establish beyond peradventure all the essential elements of these affirmative defenses. *Ford v. City of Dallas*, 2007 WL 2051016, at *1 (N.D. Tex. Jul. 12, 2007); *Fontentnot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986). "This means that [First Student] must demonstrate, without genuine and material factual dispute, and as a matter of law, that it was unable to reasonably accommodate [Antoine's] religious beliefs without incurring undue hardship." *Ford*, 2007 WL 2051016, at *1. First Student failed to do this, and the district court apparently labored under a different and mistaken standard. The resulting grant of summary judgment was therefore reversible error.

The district court erred when it granted summary judgment based upon an erroneous definition of reasonable accommodation, which found a single purported accommodation with no effect whatsoever to be a reasonable accommodation, and therefore failed to consider the other accommodations that could have been used by First Student to eliminate the work-religion conflict experienced by Antoine without causing any undue hardship for First Student.

## A.  The district court erred by holding an employer offer which had no effect upon the work-religion conflict was a reasonable accommodation as a matter of law.

The district court granted summary judgment to First Student, reasoning that "the Court finds that First Student attempted to reasonably accommodate [Antoine's] religious belief [.]" USCA5 943 (citations omitted). The district court misapplied the law defining reasonable accommodation. An opportunity which does nothing to reduce, let alone eliminate, the work-religion conflict cannot be a reasonable accommodation.  If the reasoning of the district court were to be accepted, it would effectively amend the requirement of reasonable accommodation out of Title VII.

The supposed "opportunity" for swaps in this case was wholly illusory and had no effect upon the work-religion conflict that Antoine experienced. Such "swaps" were not possible or effective accommodations because they were flatly

prohibited by the CBA which plainly states, "There shall be no swapping of routes." USCA5 490. In order for such swaps to be permitted (or effective) as a possible accommodation, the union must first agree to a "side agreement." USCA5 421; *see also* USCA5 427. That "side agreement" would be a local MOU. USCA5 427. Thus, a local MOU was required before any such accommodation could be offered or have any effect, and no such MOU was ever obtained. USCA5 427. First Student never made any effort to negotiate the required local MOU, and there has never been any such MOU in effect.

The purported accommodation in this case – an illusory "opportunity" based upon possible modifications of the CBA which were never pursued or negotiated, let alone actually implemented, by First Student – does not eliminate the conflict. It does not reduce the conflict. In fact, the purported accommodation does absolutely nothing. Such an ineffective purported "accommodation" is no accommodation at all, and cannot be a reasonable accommodation as a matter of law.

**1.    Supreme Court precedent requires that an accommodation eliminate the work-religion conflict in order to be a reasonable accommodation.**

The Supreme Court has twice addressed the religious accommodation requirement of Title VII. Both times, the Supreme Court has made clear that an

accommodation is reasonable if, and only if, it eliminates the conflict between the employee's religious belief and work requirements. This Circuit has followed the Supreme Court by adopting the same elimination standard for evaluating the reasonableness of any purported "accommodation." The district court ignored this law to grant summary judgment based upon the novel concept of a mere "attempt" to offer an opportunity to eliminate the conflict. USCA5 943. An attempt to offer an opportunity to eliminate the work-religion conflict simply is not the same thing as actually eliminating the conflict, and the district court's failure to recognize this commonsense distinction is reversible error.

The Supreme Court has made clear that unless an accommodation is effective, it cannot be a reasonable accommodation, and the employer must therefore prove undue hardship. This fundamental principle was first established in *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63 (1977). In *Hardison*, a Sabbath observer was discharged after refusing to work when his scheduled shift fell on his Sabbath. Although the employer had "attempted to find a solution," had provided a partial accommodation (which addressed some days of religious observance by the plaintiff), and had provided the plaintiff with a chance to "swap shifts, which apparently was normal procedure," 432 U.S. at 77, these "attempts" and "opportunities" did not eliminate the conflict, and were therefore did not end

the analysis without consideration of undue hardship.

Because these efforts did not fully eliminate Hardison's work-religion conflict, the Supreme Court examined three other proposed accommodations to ascertain whether these other methods of eliminating the work-religion conflict created undue hardship for the employer. 432 U.S. at 76-85. *Hardison* did not decide that an accommodation that failed to eliminate the conflict (*i.e.*, an "attempt," an "opportunity," or a reduction of the conflict that fell short of eliminating the conflict) was reasonable. Rather, *Hardison* considered proposed accommodations which would have eliminated the conflict and concluded that each would impose undue hardship.

In so doing, *Hardison* applied an elimination standard for reasonable accommodation. As the district court correctly noted, there is no reason to consider undue hardship if there has been a reasonable accommodation. USCA5 943. Thus, if the Supreme Court viewed an ineffective attempt to accommodate to be a reasonable accommodation, the majority of the *Hardison* opinion would be irrelevant and unnecessary. There would be no need to discuss what constitutes undue hardship if TWA had already offered a reasonable accommodation. By addressing undue hardship, *Hardison* makes clear that anything less than elimination of the work-religion conflict is insufficient to be a reasonable

accommodation. There would be no reason for the Supreme Court to address alternative accommodations if TWA's less than fully effective attempts, opportunities and reductions of the conflict were reasonable accommodations. This is the very analysis that the district court failed to perform.

The fact that *Hardison* acknowledged the less-than-fully-effective accommodations and then went on to discuss the undue hardship that was created by other alternatives flies in the face of any test other than elimination of the conflict for the reasonableness of an accommodation. *Hardison* explicitly states that reasonable accommodation or undue hardship is required by Title VII, and equally clearly determined that for an accommodation to be reasonable, it must eliminate the conflict. 432 U.S. at 75. In the absence of an accommodation that eliminates the conflict, the dispositive issue is (as it was in *Hardison*) undue hardship.

*Ansonia v. Philbrook,* 479 U.S. 60 (1986), was the Supreme Court's second occasion to address reasonable accommodation. In *Ansonia*, another scheduling case, the Supreme Court reinforced the requirement that an accommodation must effectively eliminate the work-religion conflict in order to be reasonable. In *Ansonia*, the Supreme Court opined favorably on just such a measure, stating that an employer's "requiring [the employee] to take unpaid leave for holy day

observance that exceeded the amount allowed by the collective-bargaining agreement would generally be a reasonable one." *Ansonia*, 479 U.S. at 70. The Court explained that:

> The provision of unpaid leave eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully religious holy days and requires him only to give up compensation for a day that he did not in fact work.

*Ansonia*, 479 U.S. at 70. While the employee need not be offered her preferred accommodation, for example, need not be paid for the absence, the accommodation must be effective and must eliminate the work-religion conflict in order to be reasonable. *Ansonia* makes explicit the elimination standard that was adopted in *Hardison*. When explaining why the accommodation at issue was reasonable, *Ansonia* referred to elimination of the conflict and not to any more attenuated "opportunity" or "attempt" to provide an opportunity.

> **2.     Fifth Circuit precedent requires that an accommodation eliminate the work-religion conflict in order to be a reasonable accommodation.**

The elimination standard employed by the Supreme Court in *Hardison* and *Ansonia* has been adopted by this Circuit, which has held that an accommodation that does not fully and completely eliminate the conflict between work and

religion is not a reasonable accommodation. *EEOC v. Universal Mfg. Corp.,* 914 F.2d 71, 73 (5th Cir. 1990) (reversing summary judgment for employer in scheduling case). To conclude otherwise would permit employers to offer incomplete "accommodations" which do not effectively accommodate the employee's religious practice — a result at odds with the plain language of Title VII and aptly characterized by this Court in *Universal Manufacturing* as "patently unreasonable." 914 F.2d at 73. In short, under Fifth Circuit law, an accommodation must not only be effective, but must be fully effective (*i.e.,* must eliminate) the work-religion conflict in order to be reasonable.

This Court has consistently found accommodations to be reasonable only when they eliminate the work-religion conflict. *Universal Manufacturing* clarified the elimination standard, and followed *Hardison* to hold that a partially effective accommodation of the employee's religious beliefs, so that the work-religion conflict was reduced but not eliminated, was not a reasonable accommodation. 914 F.2d at 73. In *Universal Manufacturing*, the employer discharged an employee after the partial accommodation failed to fully eliminate the work-religion conflict. The district court granted summary judgment on the grounds that the partially effective accommodation was a reasonable accommodation. This Court reversed and remanded for trial on the issue of the reasonableness of the accommodation

and undue hardship.

*Eversley v. MBank Dallas*, 843 F.2d 172, 176 (5th Cir. 1988), illustrates the application of the elimination standard. In *Eversley*, an employee was unable to work his scheduled shift due to religious reasons. The employer located another job in the "Lock Box Department" which provided an effective and complete accommodation. 843 F.2d at 174-75. The employer, among other things, "located another job in the bank … which Eversley refused." 843 F.2d at 176. This job would have eliminated the conflict, but Eversley rejected the job. 843 F.2d at 175. *Eversley* applied the elimination standard found in *Hardison* and *Ansonia* to conclude that this was a reasonable accommodation, and went on to conclude that other potential accommodations would have created undue hardship. 843 F.2d at 176.

First Student's purported "accommodation" plainly contravenes the elimination standard adopted in *Eversley* and *Universal Manufacturing*, and the district court's conclusion that an illusory "opportunity" or "attempt" which has absolutely no effect is a reasonable accommodation is a clear deviation from the established law of this Circuit. The resulting summary judgment should be reversed.

The Fifth Circuit cases relied by the district court confirm that it erred in its

analysis of reasonable accommodation. The district court relied upon *Bruff v. North Mississippi Health Services,* 244 F.3d 495 (5th Cir. 2001), USCA5 939, which addressed a rather different situation arising from the intersection of *Eversley* and *Universal Manufacturing*. As was the case in *Eversley*, the employee refused to cooperate with the accommodation. The issue in *Bruff* was what effect this refusal would have where the efficacy of the accommodation (and hence its reasonableness under *Universal Manufacturing*) was unclear. In *Bruff*, the accommodation meant that the "likelihood of encountering further [work-religion] conflicts … would be reduced[.]" 244 F.3d at 501.

As a result of the employee's refusal to cooperate in *Bruff*, the efficacy of the employer's offered accommodation (*i.e.,* whether it would eliminate or merely reduce the conflict) was impossible to determine. In *Bruff*, the employee was a counselor who refused to counsel patients on certain subjects, allegedly for religious reasons. 244 F.3d at 497. The employer offered (among other things) to give the employee thirty days and the assistance of its in-house employment counselor to find another position where the likelihood of the work-religion conflict would be reduced. The employee refused this offer and refused to apply for at least one such position, insisting on the accommodation of her choice. 244 F.3d at 502. In short, Bruff's refusal to cooperate in the accommodation process

45

effectively short-circuited that process. In this case, unlike in *Bruff*, Antoine never rejected an effective accommodation because none was ever offered, and the only proposed accommodation was actively frustrated by Franklin.

Although First Student now denies this, Franklin stated to Antoine and an independent witness that he and the dispatchers would "find a driver to swap routes" with Antoine. USCA5 724. Such arrangements were something that a dispatcher "could do [] so long as she received approval from . . . Franklin." USCA5 779. Franklin never made any such attempt, and he never informed the dispatchers of his approval to permit them to do so. He essentially said that he would take the steps necessary to work out a resolution, and then did nothing. In contrast, even while believing that Franklin was working to resolve the conflict, Antoine attempted to cooperate in the accommodation process by taking the initiative to locate a willing partner for a swap. USCA5 518-20, 893, 951-52.

Franklin actively undermined Antoine's efforts by arbitrarily imposing new conditions when Antoine brought volunteers to his attention. USCA5 565. As a result, this supposed "opportunity" never materialized and had no effect upon the work-religion conflict experienced by Antoine. USCA5 421. On the facts of this case, it clearly cannot be said "beyond peradventure" that the accommodation was rendered ineffective by Antoine.

*Eversley*, *Universal Manufacturing,* and *Bruff* make clear that an accommodation must either be effective, or be rendered ineffective by an employee's refusal to cooperate if that accommodation is to be a reasonable accommodation. The illusory "opportunity" allegedly offered to Antoine was not effective – it did absolutely nothing to eliminate or even reduce the conflict. As a result, First Student's efforts cannot be a reasonable accommodation under the law of this Circuit.

In this case, the "voluntary swap," which was the only potential accommodation ever put forth by Franklin, never occurred and had no effect upon the work-religion conflict experienced by Antoine. USCA5 421. The significance of this simple and dispositive fact is compounded by First Student's contradictory positions regarding the purported accommodation. First Student argues that although voluntary shift swaps were prohibited by the CBA and therefore required the consent of the local union in the form of a local MOU, the "opportunity" for these swaps was a reasonable accommodation despite their prohibition by the CBA, even in the absence of an MOU. USCA5 955. This supposed "opportunity" was wholly illusory, because the CBA states, "There shall be no swapping of routes." USCA5 490. Guerdon admits that such an "opportunity" was prohibited by the CBA "on a long term basis" although the union might agree to a "side

47

agreement" for a "very short term basis." USCA5 421; *see also* USCA5 427. A local MOU would be required, and no such MOU was ever obtained. USCA5 427. First Student never made any effort to negotiate the required local MOU, and there has never been any such MOU in effect. First Student's claim that this "attempt" to provide an illusory "opportunity" to reduce or eliminate the work-religion conflict cannot be a reasonable accommodation under the law of this Circuit which follows *Hardison* and *Ansonia*.

   3.   **The district court decision creates a conflict with the law of at least five sister circuits which requires that an accommodation eliminate the work-religion conflict in order to be a reasonable accommodation.**

The district court's finding that an ineffective attempt was a reasonable accommodation, USCA5 943, creates an unnecessary conflict with at least five other circuits that have addressed the issue of whether something less than elimination of the conflict is a reasonable accommodation. Each of these circuits has determined that elimination of the conflict is required in order for a proffered accommodation to satisfy the affirmative defense of reasonable accommodation as a matter of law. The Sixth Circuit, in accord with the Second, Third, Seventh and Ninth Circuits, has held – consistent with Fifth Circuit precedent in *Universal Manufacturing* – that:

> If the employer's efforts fail to *eliminate* the employee's religious
> conflict, the burden remains on the employer to establish that it is
> unable to reasonably accommodate the employee's beliefs without
> incurring undue hardship.

*Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994) (emphasis supplied).

The Second Circuit has expressly adopted elimination of the work-religion conflict as the standard by which to measure the reasonableness of a purported accommodation. *Baker v. The Home Depot* vacated a grant of summary judgment against a Sabbath-keeper's Title VII accommodation claim on the grounds that the accommodation offered by the employer was not reasonable "because it does not eliminate the conflict between the employment requirement and the religious practice[.]" 445 F.3d 541, 548 (2nd Cir. 2006).

The Third Circuit reached a similar conclusion in *Getz v. Penn. Dept. of Public Welfare,* reasoning that a reasonable accommodation is one that jeopardizes neither the employee's job nor the religious practice. 802 F.2d 72, 73-74 (3rd Cir. 1986). This standard was highlighted in *EEOC v. GEO Group*, 616 F.3d 265 (3rd Cir. 2010), where summary judgment was affirmed against a contracted prison employee who, for religious reasons, sought a deviation from the employer's dress code. The case was decided, over dissent, on the issue of undue hardship, since the

accommodation failed to "eliminate[] the conflict between employment requirements and religious practices by allowing the individual to observe fully." 616 F.3d at 291 (dissent) (noting panel majority holding and quoting *Ansonia*, 479 U.S. at 70).

The Seventh Circuit also requires that in order for an accommodation to be reasonable, it must eliminate the work-religion conflict. In *EEOC v. Ilona of Hungary, Inc.,* the Seventh Circuit affirmed in relevant part a judgment for an employee, explaining that the accommodation offered in that case "cannot be considered reasonable, however, because it does not eliminate the conflict between the employment requirement and the religious practice." 108 F.3d 1569, 1576 (7th Cir. 1997).

The Ninth Circuit has also followed the Supreme Court's interpretation of the accommodation requirement in Title VII. *Opuku-Boateng v. State of Cal.* explained that if negotiations between the employer and the employee "do not produce a proposal by the employer that would eliminate the religious conflict, the employer must either accept the employee's proposal or demonstrate that it would cause undue hardship were it to do so." 95 F.3d 1461, 1467 (9th Cir. 1996). *Opuku-Boateng reversed* judgment for an employer on a Sabbath scheduling claim. Each of these circuits has followed the Supreme Court's instructions in

*Hardison* and *Ansonia*, and has determined that an accommodation must eliminate the work-religion conflict if it is to be a reasonable accommodation.

Although this law is clear, two circuits have employed a different test for reasonable accommodation. The Fourth Circuit has held that merely reducing the conflict by offering to "reduce the number of working Saturdays to as few as possible would not accommodate an employee whose religion prohibits working on *any* Saturday." *Benton v. Carded Graphics, Inc.*, 1994 WL 249221 at *2 (4th Cir. 1994) (unpublished); *accord EEOC v. Ithaca Indus., Inc.,* 849 F2d 116 (4th Cir.) (*en banc*), *cert. denied*, 488 U.S. 924 (1988) (reviewing statutory history). It has also held that "total" accommodation (or elimination) is not required, and a more generalized totality of the circumstances test applies to reasonable accommodation. *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 314 (4th Cir. 2008) (noting circuit split and employing totality of circumstances test). The Eighth Circuit has employed a similar test. *Sturgill v. United Parcel Service, Inc.*, 512 F.3d 1024 (8th Cir. 2008). Under either standard, the result is the same – an accommodation must be effective if it is to be a reasonable accommodation.

The district court's deviation from this established law to hold that an ineffective accommodation which does nothing to affect, let alone eliminate, the work-religion conflict creates a stark and unnecessary conflict with this

established law.

**4.     Because Franklin frustrated the accommodation process, the district court erred by failing to consider whether other accommodations would have eliminated the conflict without creating undue hardship.**

Summary judgment was error for a second, independent reason. As this Court noted in *Brener v. Diagnostic Ctr. Hosp.,* 671 F.2d 141 (5th Cir. 1982), "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business. Although the statutory burden to accommodate rests with the employer, the employee has a correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer." 671 F.2d at 145-46. As *Brener* makes clear, this duty "rests with the employer." The EEOC's implementing regulations address this specific situation (a scheduling accommodation by shift exchanges), explaining that in such a situation employers have a duty to assist the employee in finding a voluntary substitute, which includes "promot[ing] an

atmosphere in which such substitutions are favorably regarded." 29 C.F.R. § 1605.2(d)(i).[4]

First Student did not promote such an atmosphere, and instead actively opposed it. At the same time that he made the illusory offer of voluntary shift swaps, Franklin actively undermined and frustrated this supposed "opportunity" to exchange shifts. During the November 6 meeting, Franklin represented that he and the dispatchers would "find a driver to swap routes[.]" USCA5 724. Franklin never even attempted to arrange an exchange of shifts, and he never discussed this issue with the dispatchers. Instead, after claiming that he would take action to resolve Antoine's conflict, he did nothing at all.

---

[4] First Student expended much effort arguing before the district court that Antoine did not disclose his religious beliefs before he was hired, USCA5 376-77, 380-81, 388, 399, 901, something apparently accepted as true (although disputed) by the district court. USCA5 927-28. This fact is not material because the employer's accommodation duty under Title VII does not depend upon whether an employer learns about the conflict during the hiring process or after hire. Title VII by its express terms applies to applicants for employment as well as existing employees. *See Smith v. Xerox Corp.,* 602 F.3d 320, 326 (5th Cir. 2010) (affirming judgment in favor of applicant and noting that Title VII requirements apply to job applicants, citing 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e-3(a)); *see also Toledo v. Nobel-Sysco, Inc.,* 892 F.2d 1481, 1488-89 (10th Cir. 1989) (refusal to hire applicant on basis of religious accommodation equally unlawful under Title VII); *Minkus v. Metropolitan Sanitary Dist. of Greater Chicago,* 600 F.2d 80, 85 (7th Cir. 1979) (same); Moreover, to the extent that this fact is material, it is disputed.

Although a reasonable jury could find Franklin's actions to be an attempt to lull Antoine into complacency, they did not have this effect and Antoine actively sought a driver to exchange shifts. However, every time Antoine found another driver willing to exchange shifts, Franklin interfered with and undermined these efforts by arbitrarily imposing new conditions. USCA5 565. As a result, no voluntary exchange ever occurred, and the alleged "opportunity" had no effect on Antoine's work-religion conflict. USCA5 421. An employer has not offered a reasonable accommodation by allowing voluntary substitutes while at the same time taking efforts to undermine an employee's ability to secure such substitutes. *McGuire v. General Motors Corp.,* 956 F.2d 607, 610 (6th Cir. 1992). This is precisely what the record demonstrates in this case.

The district court erred when it granted summary judgment on the issue of reasonable accommodation based upon an erroneous legal standard applied to disputed facts. The real issue is: Could First Student use alternative accommodations to eliminate the work-religion conflict without undue hardship? The factual record makes clear that the answer to this question is "Yes," but the district court never addressed this question due to its erroneous ruling on the issue of reasonable accommodation. The grant of summary judgment should therefore be reversed and this case remanded for trial.

**B.     The district court erred by ignoring undue hardship where the factual record shows that First Student could have accommodated Antoine without undue hardship.**

The district court did not reach the issue of undue hardship, reasoning that "Because the Court finds that First Student attempted to reasonably accommodate [Antoine's] religious belief, the Court need not reach the question of whether any accommodation suggested by [Antoine] would pose an undue hardship on First Student. In short, because First Student offered a reasonable accommodation to [Antoine], the Court need not determine whether First Student has demonstrated undue hardship in light of [Antoine's] proposed alternative accommodations." USCA5 943 (citations omitted). This was reversible error.

**1.     Because First Student's purported accommodation did not affect the work-religion conflict, the district court erred by failing to consider whether other accommodations would have eliminated the conflict without creating undue hardship.**

The cases cited by the district court confirm that undue hardship rather than reasonable accommodation was the real issue in his case. Although the district court ruled on the issue of reasonable accommodation, in each of these cases cited by the district court, there was a finding of undue hardship. *Brener v. Diagnostic Ctr. Hosp.,* 671 F.2d 141 (5th Cir. 1982), was relied upon by the district court. USCA5 939, 941-42. *Brener* was an appeal after a bench trial and findings of fact

and conclusions of law. *See* 671 F.2d at 146 & n.4. The accommodation at issue in *Brener* involved the hiring of a substitute employee. 671 F.2d at 146. The district court found this to be an undue hardship, and this Court held that this finding was not clearly erroneous. 671 F.2d at 146-47. *Brener* demonstrates that these are factual issues not properly resolved on summary judgment. The district court's reasoning in this case is essentially that because the defendant in *Brener* prevailed <u>on factual issues before a factfinder after a trial</u>, First Student is entitled to judgment as a matter of law in this case. *Brener* says nothing of the sort, and the recognition of these issues as factual issues for the factfinder in *Brener* contradicts any such argument.

The district court cites *Beadle v. City of Tampa*, 42 F.3d 633 (11th Cir. 1995). USCA5 942. However, *Beadle* (like *Brener*) was an appeal after a bench trial. 42 F.3d at 635. *Beadle* was a case involving a police officer, and the Eleventh Circuit expressly noted that a police department receives greater deference than other employers. 42 F.3d at 637. Without conceding that such exaggerated deference is appropriate, it is sufficient to note that similar considerations are not present in this case which does not involve a police department. More importantly, *Beadle* was decided on the issue of undue hardship, not reasonable accommodation.  42 F.3d at 637-38.  The district court's mis-

construction of *Beadle* confirms both the district court's error and the simple fact that undue hardship, rather than reasonable accommodation, is the real issue in this case.

The district court also cites *Weber v. Roadway Express, Inc.,* 199 F.3d 270 (5th Cir. 2000). USCA5 939, 941-42. *Weber* further confirms that undue hardship rather than reasonable accommodation, is the dispositive issue. *Weber* involved the intersection of religion and gender (an issue not present in this case). In *Weber*, the accommodation at issue was a truck driver's request to be "skipped over" for overnight jobs that would require him to work with a female partner. 199 F.3d at 274. Like *Brener*, *Weber* was decided on the issue of undue hardship.199 F.3d at 274-75. Contrary to the reasoning of the district court, *Weber* was not decided on the issue of reasonable accommodation. 199 F.3d at 274-75.

An issue similar to the one in this case arose in *Sturgill v. United Parcel Service, Inc.*, 512 F.3d 1024 (8th Cir. 2008), which is unaddressed by the district court, and which confirms the district court's error in granting summary judgment by refusing to consider alternative accommodations. In *Sturgill*, a UPS package car driver who was a Seventh-day Adventist was offered a similar illusory "accommodation" (in *Sturgill*, it was the opportunity to bid for posted jobs). 512 F.3d at 1028. In *Sturgill*, the work-religion conflict was virtually identical – a brief

period of time during the winter when Sturgill's Friday shift extended past sundown. 512 F.3d at 1028-29. In Sturgill, as here, the employee-driver was discharged despite the fact that a temporary change to the employer's operations would have eliminated the conflict. 512 F.3d at 1033. The driver in *Sturgill* defeated summary judgment, twice defeated directed verdict (JAML) motions, obtained a favorable jury verdict, and successfully defended against JAML after the verdict. In *Sturgill*, as here, the dispositive issue was not merely reasonable accommodation, since the purported accommodation – an illusory "opportunity" to bid on other positions that did not exist, had no effect upon the work-religion conflict – but undue hardship, and *Sturgill* confirms that these are properly issues of fact.

These cases make clear that the proper legal standard to use in evaluating whether a potential accommodation is a reasonable accommodation is whether that accommodation eliminates the work-religion conflict. Where a potential accommodation eliminates the conflict, it is a reasonable accommodation. However, where the potential accommodation does not eliminate the conflict, the affirmative defense of reasonable accommodation is not established as a matter of law, and the issue of other possible accommodations and any undue hardship must be addressed. Viewed under the proper legal standard, it is clear that whether First Student's purported accommodation - an illusory (and frustrated) "opportunity" to voluntarily

exchange shifts - is reasonable is an issue of fact that is properly resolved by the jury. This is entirely consistent with the law of this Circuit, under which determinations of reasonableness – including the reasonableness of an offered accommodation – are normally issues of fact for the jury. *Bruff,* 244 F.3d at 499, 503.

Aside from any issue as to whether the divergent standard adopted in *Sturgill* is correct, *Sturgill* confirms that even under the most lenient "totality of the circumstances" standard for reasonable accommodation that is adopted by the Eighth (and arguably the Fourth) Circuit, the reasonableness of the accommodation is properly an issue of fact for the jury. 512 F.3d at 1032-33. This result is even clearer under the law of this Circuit which, like the vast majority of circuits, requires elimination of the conflict. *Bruff,* 244 F.3d at 503. This is particularly true at summary judgment, since First Student bears the burden of proof on this affirmative defense beyond peradventure. *Ford,* 2007 WL 2051016, at *1; *Fontentnot,* 780 F.2d at 1194. The district court's contrary conclusion was a misapplication of the legal standard for reasonable accommodation to disputed facts, and should be reversed.

**2.    Alternative accommodations did not cause undue hardship in the form of decreased safety.**

In the absence of a reasonable accommodation, First Student bears the burden to prove that it was unable to provide such an accommodation without incurring undue hardship. *Bruff*, 244 F.3d at 499-500. Because First Student bears the burden of proof, it may not obtain summary judgment unless it establishes beyond peradventure all the essential elements of this defense as a matter of law. *Ford*, 2007 WL 2051016, at *1; *Fontentnot*, 780 F.2d at 1194.

An employer does not sustain its burden of proof on the issue of undue hardship merely by showing that an accommodation would be bothersome to administer or disruptive of the operating routine. *Smith v. Pyro Min. Co.,* 827 F.2d 1081, 1085 (6th Cir. 1987); *Draper v. United States Pipe & Foundry Co.,* 527 F.2d 515, 520 (6th Cir. 1975).

The effect of the accommodations ignored by First Student does not even rise to the level of "bothersome," let alone actual hardship. Employee absences are an expected part of the routine business of First Student. USCA5 424, 429, 758. First Student recognized unpaid absences as a method of accommodation, and had in fact allowed other drivers to be absent on Fridays for reasons including religion. USCA5 746 (listing various such instances, including Muslim drivers). This was a fact that

was important to the decision in *Sturgill*. 512 F.3d at 1028 (reasons including "to attend a Little League game"). First Student admits that when Antoine informed one of his dispatchers (Ms. Phillips) about the need for someone to temporarily cover his Friday afternoon routes, she "indicated that she could do that so long as she received approval from … Franklin." USCA5 779. Franklin did not permit this normal practice, simply because "it is not convenient." USCA5 463. Franklin made no mention of any supposed safety concern, and his testimony makes clear that this accommodation, which would have eliminated the work-religion conflict, was denied even though it imposed no hardship at all upon First Student.

In determining what constitutes undue hardship, courts are "somewhat skeptical of hypothetical hardships that an employer thinks might be caused by an accommodation that never has been put into practice." *Cloutier v. Costco Wholesale Corp.,* 390 F.3d 126, 135 (1st Cir. 2004); *Smith,* 827 F.2d at 1085-86; *Brown v. Gen. Motors Corp.,* 601 F.2d 956, 960 (8th Cir. 1979); *Draper,* 527 F.2d at 520.

A claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships; instead, it must be supported by proof of "actual imposition on co-workers or disruption of the work routine." *Brown v. Polk County, Iowa*, 61 F.3d 650, 655 (8th Cir. 1995) (*en banc*), *cert. denied*, 516 U.S.

1158 (1996) (*Brown II*); *Toledo v. Nobel-Sysco, Inc.,* 892 F.2d 1481, 1492 (10th Cir. 1989); *Smith,* 827 F.2d at 1085-86; *Tooley v. Martin-Marietta Corp.,* 648 F.2d 1239, 1243 (9th Cir.), *cert. denied,* 454 U.S. 1098 (1981); *Brown v. Gen. Motors Corp.,* 601 F.2d 956, 960 (8th Cir. 1979) (*Brown I*). Such hypothetical hardships were the only type of hardships offered by First Student, and this is insufficient evidence to support summary judgment. *Grimes v. Tex. Dep't of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Ford*, 2007 WL 2051016, at *2.

None of the potential accommodations, which would result in a bench driver covering Antoine's Friday PM route (or another bidder delivering his route, with Antoine returning to bench driver status or a different route) result in any increase in cost for First Student, USCA5 458, and First Student has made no such claim. *See* USCA5 376-400. Rather, First Student claims that undue hardship is created because the use of bench drivers was a categorically unsafe practice. To the extent that First Student's hypothetical hardship rises to the level of a material "fact," it is a disputed fact, and First Student's assertion is contradicted by both its actions and the testimony of the only disinterested witness on this issue.

First Student's actions contradict its assertion of undue hardship due to vague safety concerns. First Student's argument essentially boils down to a claim that a

lack of consistency in the bus driver schedule might result in a lack of familiarity with the route, which might result in a mistake, which might increase the risk to a student, which might result in injury to that student. Even if every hypothetical and inference is drawn in favor of First Student (which is inappropriate at summary judgment), First Student's conduct contradicts and belies the claimed hardship. The very accommodation suggested (and then frustrated) by First Student – voluntary shift swaps – results in a substitute driver for Antoine's Friday PM routes, and perhaps a different driver on each Friday. If lack of consistency in the driver schedule is a true concern, First Student's supposed accommodation increases that inconsistency and the supposed hardship.

In contrast, the accommodations suggested by Antoine provide First Student with greater control and consistency of drivers. By removing himself from the route and providing a regular and consistent replacement, the alternatives proposed by Antoine reduce this supposed concern below the both the *status quo* level (finding replacements from bench divers when Antoine was absent) and First Student's supposed accommodation (*ad hoc* voluntary swaps by drivers which resulted in two substitute drivers – the two who exchanged shifts - rather than only one bench substitute for Antoine's route). The conduct of First Student contradicts its claim of a purported hardship on the basis of safety.

First Student's assertions of a vague "safety" concern are also contradicted by the testimony of Lynn Alello, the Director of Transportation for Jefferson PSD, who testified that the use of substitute drivers did not endanger the lives of students and was a safe practice for the children. USCA5 441, 448. This testimony flatly contradicts First Student's self-serving statements, and corroborates the facts evidenced by the actual conduct of First Student.

The record evidence does not end with these factual disputes. "If an employer stands on weak ground when advancing hypothetical hardships in a factual vacuum, then surely his footing is even more precarious when the proposed accommodation has been tried and the postulated hardship did not arise." *Brown I*, 601 F.2d at 960. Such is the case here. The use of bench drivers was a regular daily practice for First Student, with bench drivers covering routes (including Antoine's) virtually, if not literally, every workday. USCA5 568-75. There have been no complaints about the use of bench drivers covering Antoine's Friday PM routes. USCA5 470. First Student failed to offer any evidence whatsoever of any actual impositions. First Student merely bases its claim of undue hardship upon vague and hypothetical assertions relating to safety which are contradicted by the actual facts that occurred. Evidence such as is offered by First Student is not competent summary judgment evidence, particularly where First Student seeks summary

judgment based upon an affirmative defense. *Grimes*, 102 F.3d at 139-40; *Ford*, 2007 WL 2051016, at *1.

> **3.    Alternative accommodations did not cause undue hardship by violating the CBA.**

An employer that has failed to consider reasonable accommodations "is in no position to argue that it was unable to accommodate reasonably [an employee's] religious needs without undue hardship on the conduct of its business." *EEOC v. Arlington Transit Mix, Inc*., 957 F.2d 219, 222 (6th Cir. 1991) (reversing judgment after bench trial for this reason). First Student also asserts that certain accommodations (that were rejected out of hand) would violate the CBA. First Student's argument is merely an attempt to create a straw man. Although First Student claims that the only potential accommodation that was ever offered to Antoine was the illusory (and frustrated) "opportunity" for a voluntary swap of a full shift, several other potential accommodations were available to First Student that were simply never considered by First Student or provided to Antoine.

Each of these potential accommodations was permissible under the CBA, and none of these potential accommodations resulted in any increased cost or hardship for First Student. First Student was aware of each of these potential accommodations, and had used some of them before, but simply chose not to

bother in this case. There were at least four methods by which First Student could have, but chose not to, accommodate Antoine.

First, unpaid absences were available, but were never considered despite the fact that this very method of accommodation had been previously employed by First Student when similar work-religion conflicts had arisen in the past. Second, an exchange of part of Antoine's Friday afternoon shift was permitted by the CBA and was available to First Student, but was rejected out of hand. Third, First Student had the ability to return Antoine to his previous status as a bench driver, which would have alleviated the work-religion conflict, but simply refused to consider this potential accommodation. Fourth, the CBA provides a mechanism for voluntary route changes which was ignored by First Student, but would have eliminated the work-religion conflict.

> ### a. Allowing Antoine to use his employer-provided unpaid absences and covering his shift with bench drivers could accommodate Antoine without undue hardship.

First Student provides its drivers with "three full days they can miss and six half days of absences." USCA5 717. Prior to his Friday absences in order to observe the Sabbath, Antoine had not missed any work. USCA5 707. As a result, under First Student policy, Antoine was entitled to six half days and three full days of absences, which could be combined to cover nine Fridays, and were more than

sufficient to cover the five Friday PM shifts that resulted in his discharge and the three remaining Fridays during which a conflict existed. After this brief period, the work-religion conflict would have ended, as sunset became later. Allowing Antoine to use these absences that are provided by First Student policy would have completely eliminated the conflict. In fact, allowing Antoine to exercise his absences provided by First Student policy was alone sufficient to accommodate Antoine permanently. Despite this fact, First Student ignored its own policy and refused this employer-provided benefit to Antoine.

Allowing Antoine the benefit of the absences provided by First Student policy would not violate the CBA or cause any hardship for First Student. Most fundamentally, this was a benefit to which Antoine was entitled, but it was simply denied to him. Moreover, bench drivers were available to cover Antoine's absences. USCA5 717. On each of the five Fridays that led to Antoine's discharge, there was at least one bench driver who was available to drive Antoine's afternoon route. USCA5 770, 827-29. Antoine experienced a conflict on only two other Fridays in January. USCA5 774-75, 834. On each of these dates, nine bench drivers were available to cover his route and a few other absences, resulting in "extra" bench drivers each Friday who were paid whether they drove a route or not. USCA5 406, 834.

Employee absences are an expected part of the routine business of First Student, which is in part the reason for the payment of surplus bench drivers in the first place. USCA5 424, 429, 758. First Student recognized these unpaid absences as a method of accommodation, and had previously allowed other drivers, such as Muslims, to be absent on Fridays for reasons including religion. USCA5 746. Larry Whitler admitted that this method of accommodation did not create any hardship for First Student. USCA5 746, 748-49. Apparently, because it was not "convenient," Antoine was the exception to this established practice.

This case is similar to *Brown v. Gen. Motors Corp.,* 601 F.2d 956 (8th Cir. 1979) (*Brown I*), and to *EEOC v. Chemsico, Inc.,* 216 F. Supp.2d 940 (E.D. Mo. 2002). In *Brown I*, the plaintiff was terminated for missing Friday evening shifts for religious reasons. In *Brown I*, as here, USCA5 779, the applicable CBA contained no prohibition on the employer's allowing leave on the days at issue. In *Brown I*, as here, the employee was covered by existing employees during these absences, and the Court of Appeals reversed summary judgment for the employer on the plaintiff's Title VII religious accommodation claim.

In *Chemsico*, the plaintiff was discharged after accumulating points under the defendant's attendance policy. The defendant made no attempts to "cover" the plaintiff during her absence, but was (as was First Student) able to carry out its

business in her absence. In *Chemsico*, these facts precluded summary judgment, and exactly the same result should obtain in this case. The district court's grant of summary judgment should be reversed and the case remanded for trial.

### b. Partial shift swaps could accommodate Antoine without undue hardship.

A partial shift exchange of the last of Antoine's three Friday PM routes did not violate the CBA, and could have been done by First Student. Under the CBA, routes are subject to change, and all the drivers know this. USCA5 739. Article V of the CBA makes clear that First Student has the unilateral right to change the terms and conditions of employment "including but not limited to [the right to], … define or modify bus routes, … [and] schedule working hours" except as expressly limited in writing in the CBA. USCA5 484. Nothing in the CBA expressly prohibits a partial shift swap. USCA5 480-505. Such partial swaps have in fact been made by the dispatchers. USCA5 829 (coverage of two of Antoine's three routes), 832. First Student admits that each of the dispatchers "could do that so long as she received approval from . . . Franklin." USCA5 779.

Even if swapping an entire shift would be an undue hardship (which Antoine disputes), shift splitting may nevertheless be a reasonable accommodation that defeats summary judgment. *Balint v. Carson City, Nev.,* 180 F.3d 1047 (9th

Cir. 1999) (reversing summary judgment for this reason). First Student had the right to make such route adjustments, and in fact did so when it chose to. USCA5 829, 832. Despite this recognized ability and prior practice, First Student simply refused this method of accommodation because it was not "convenient." USCA5 463. This alternative method of accommodation, which did not impose any hardship whatsoever on First Student, defeats summary judgment.

### c. Returning Antoine to bench driver status could accommodate Antoine without undue hardship.

Bench drivers are a recognized and known quantity under the CBA. USCA5 489. If not assigned to a route, bench drivers leave at 4:30 PM or 5:00 PM. USCA5 517-18, 719. This work schedule fully accommodated Antoine's religious practice.

Even when assigned to a route, approximately 80% of the bench drivers finish their routes by 5:00 PM. USCA5 462. Dispatchers assign bench drivers, and such assignments are not made by seniority. USCA5 959. Thus, as a bench driver, on any particular Friday, Antoine could receive a "cover" assignment that permitted him to be finished before sundown. Antoine offered to return to work as a bench driver. USCA5 453, 707. However, First Student simply ignored this offer, even though it would have solved the conflict, and did not impose any hardship

upon First Student, this would merely fill the vacated position through the normal bidding and assignment processes under the CBA. This, too, was an accommodation that could have been provided to Antoine without any change of First Student's normal business practice, and is independently sufficient to defeat summary judgment.

### d.    A voluntary route change could accommodate Antoine without undue hardship.

Article IX, Section 12 of the CBA contains a provision for voluntary route changes. Under that process, "A driver or monitor that wishes to vacate his or her route will have the route posted by the Employer and it will be advertised for three (3) days and assigned to the senior driver picking the route. The position vacated by the picking driver or monitor will be assigned to the driver or monitor that caused the vacancy." USCA5 490. In other words, in order to accomplish a route change for Antoine, First Student would post the route for bid. The bidder with the highest seniority would receive Antoine's route, and Antoine would in turn take the successful bidder's route. USCA5 956. If there was no bidder, the route would be assigned to a bench driver and Antoine would become a bench driver. USCA5 958.

In this case, bus driver Judith Jackson testified that she would have bid on Antoine's route if it had been posted. USCA5 725. First Student was aware that

placing Antoine on a different route was a  possibility.  USCA5 561 ("there  is nothing to say that we can't put him on another route which does not include Friday PM's"). Despite this awareness, Franklin never offered this as an accommodation to Antoine. USCA5 419-20. The CBA expressly authorizes the voluntary route change process, and under that process, Antoine would have been accommodated when Jackson exchanged routes with Antoine. Such an exchange created no hardship for First Student, and resulted in two drivers exchanging routes which they would be driving consistently every day of the week. This accommodation, too, was ignored by First Student, and is independently sufficient to defeat summary judgment.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment should be reversed in its entirety and the case remanded for trial.

Respectfully submitted,

ROBERT E. ANTOINE,
Appellant


 /s/Todd R. McFarland
Todd R. McFarland
Associate General Counsel,
General Conference of Seventh-day Adventists
12501 Old Columbia Pike
Silver Spring, MD. 20904-6600
(301) 680-6321 (Voice)
(301) 680-6329 (Fax)
mcfarlandt@gc.adventist.org

and

Charles M. Kester, #94238
KESTER LAW FIRM
1160 N. College Ave.
Fayetteville, AR 72703
(479) 582-4600 (Voice)
(479) 571-1671 (Fax)
cmkester@nwark.com

and

Victor R. Farrugia
1100 Poydras Street, Suite 2010
New Orleans, LA 70163
(504) 525-0250 (Voice)
(504) 293-0651 (Fax)
vrfarrugia@igc.org

*Attorneys of Record for Appellant*

## CERTIFICATE OF SERVICE

I, Todd R. McFarland, attorney of record for the Appellant, do hereby certify that on this 24th day of January 2012, I filed this document with the Fifth Circuit Court of Appeals using the CM/ECF filing system which will cause a copy of the document to be delivered to:

Magdalen Blessey Bickford
Jackson Lewis, LLP
650 Poydras Street
Suite 1900
New Orleans, LA 70130

via electronic mail.


/s/Todd R. McFarland
Todd R. McFarland

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

- This brief contains 13,670 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

- This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

Respectfully Submitted,

/s/Todd R. McFarland
Todd R. McFarland
Associate General Counsel,
General Conference of Seventh-day Adventists
12501 Old Columbia Pike
Silver Spring, MD. 20904-6600

*Attorney of Record for Appellant*

Date: January 24, 2012